**KENNETH MAPP and JANELLE SARAUW, Appellant/Plaintiffs**

**v.**

**CAROLINE FAWKES, in her Official Capacity as Supervisor of Elections, ARTURO WATLINGTON, in his Official Capacity as the Chairman of the St. Thomas District Board of Elections and Secretary of the Joint Board, ADELBERT "BERT" BRYAN, in his Official Capacity as Chairman of the St. Croix District Board of Elections, and ALICIA WELLS, in her Official Capacity as the Chairperson of the Joint Board of Elections, Appellees/Defendants**

S. Ct. Civil No. 2014-0073

Supreme Court of the Virgin Islands

November 14, 2014

TERRI GRIFFITHS, ESQ., St. Thomas, USVI, *Attorney for Appellants.*

KIMBERLY L. SALISBURY, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellees.*

JOEL H. HOLT, ESQ., Law Office of Joel H. Holt, P.C., St. Croix, USVI, *Attorney for Amicus Curiae Donna Christensen.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(November 14, 2014)

PER CURIAM. Kenneth Mapp — an independent candidate for Governor of the Virgin Islands, and a qualified voter — as well as another Virgin Islands voter, Janelle Sarauw, appeal from the Superior Court's oral November 1, 2014 order denying their motion for a preliminary and permanent injunction and dismissing their complaint, with prejudice,

against Caroline Fawkes — the Supervisor of Elections — and the Chairs of the Joint Board of Elections, St. Thomas-St. John Board of Elections, and the St. Croix Board of Elections. Additionally, Donna Christensen, the Democratic Party's nominee for Governor, has moved to participate as amicus curiae and fully joins in Mapp and Sarauw's request for emergency relief. For the reasons that follow, we reverse the November 1, 2014 order, and direct the Superior Court, on remand, to enter judgment in favor of Mapp and Sarauw and mandate Fawkes and the Boards of Elections to use the DS200 electronic voting machines for the run-off election scheduled for November 18, 2014.

## I. BACKGROUND

The DS200 Precinct Scanner and Tabulator is a vote tabulation machine, intended for use in government elections, developed and marketed by Election Systems & Software, Inc. ("ES&S") that electronically scans and calculates paper ballots that are "fed" into it by the voters.[1] If a voter has "undervoted" — cast votes for fewer than the number of candidates authorized by law — or "overvoted" — cast votes for more candidates than authorized — the DS200 notifies the voter before accepting the ballot so that the voter may choose between correcting the ballot or submitting it without any changes. Once inserted into the machine and tabulated, the DS200 does not destroy the paper ballot, but preserves it in the event of a recount.

On October 27, 2014, the Joint Board of Elections held a meeting and voted to prohibit voters from feeding their own ballots into the DS200.[2] Instead, the Joint Board determined that voters should submit their completed ballots into the bottom storage bin of the machine, which

---

[1] Pursuant to chapters 19 and 20 of title 18 of the Virgin Islands Code, voting in all party primaries, general elections, and referenda must be conducted by electronic voting machine. 18 V.I.C. §§ 501-08; 521-24. Because the issue is not before us, we express no opinion as to whether a machine that electronically scans and calculates paper ballots qualifies as an "electronic voting machine" under Virgin Islands law.

[2] In their appellate brief, Fawkes and the Election Board Chairs assert that this decision had been made at a meeting that occurred on October 20, 2014. However, at the November 1, 2014 hearing in this matter, counsel for all parties proceeded under the assumption that the Joint Board's official vote occurred on October 27, 2014, and Fawkes and the Election Board Chairs have pointed to no record evidence indicating that the Joint Board took this action on a date other than October 27, 2014.

election judges and others would, at the conclusion of the voting, sort into two groups. The first group, consisting of ballots where the voter opted to vote "straight-ticket" — a mechanism through which votes are automatically cast for all members of a political party running for each office — would be evaluated by members of the elections boards, while the second group — consisting of all other ballots — would be fed into the DS200 by elections staff. The Joint Board announced that it adopted this last-minute policy change due to purported problems with the DS200's tabulation of straight-ticket ballots. Specifically, some members of the Joint Board believed that the DS200 tabulated these ballots in a manner inconsistent with voter intent.

Two days later, on October 30, 2014, Mapp and Sarauw sued Fawkes and the Chairs of the Elections Boards, and requested that the Superior Court issue a declaratory judgment that the Joint Board's actions were unlawful and also enjoin Fawkes and the boards from implementing this change in election procedure. Because the 2014 general election was scheduled for Tuesday November 4, 2014, the Superior Court held an emergency hearing on Saturday November 1, 2014, which served as both a hearing on the request for injunctive relief and a trial on the merits.

At the hearing, the Superior Court first heard testimony from Dr. Tonjia Coverdale, an assistant professor of computer information systems at the University of the Virgin Islands who also served as the Elections Technology Territorial Coordinator for the Elections of the Virgin Islands.[3] During her testimony, Dr. Coverdale, by way of example, explained that if a voter marked the oval to vote straight-ticket for the

---

[3] In their appellate brief, Mapp and Sarauw contend that the Superior Court committed reversible error by failing to allow Dr. Coverdale to testify in a dual capacity as both a fact and expert witness. Specifically, they argue that the Superior Court repeatedly refused to allow their counsel to ask Dr. Coverdale the questions necessary to establish her qualifications as an expert. Although not determinative to our result given our holding that Mapp and Sarauw were entitled to judgment even though the Superior Court only permitted Dr. Coverdale to testify as a fact witness, to the extent the issue may recur in any hearing on remand, we hold that the Superior Court erred in preventing Mapp and Sarauw from even attempting to qualify Dr. Coverdale as an expert. While the Superior Court seemingly based its holding on the fact that Mapp and Sarauw never provided counsel for Fawkes and the Election Board Chairs with Dr. Coverdale's expert report, we note that Federal Rule of Civil Procedure 26(a)(2) — made applicable through Superior Court Rule 39(a) — only requires a written report from an expert witness "if the witness is one retained or specially employed to provide expert testimony in the case," which was clearly not the case here. And while Federal Rule 26(a)(2)(C) requires various disclosures from expert witnesses to be filed "at least 90 days before the date

Democratic Party, but simultaneously marked the oval for an independent candidate for Governor, the DS200 would consider this as a vote for the independent candidate — rather than a vote for the Democratic candidate or as a spoiled ballot — because the voter has manifested an intent to void his or her straight-ticket selection in that particular race. (Hr'g Tr. 75-76.) Votes for Democratic candidates in other races, however, would be retained, provided that the voter did not cast votes for non-Democrats in those races. (Hr'g Tr. 83-84.)

The Superior Court also heard testimony from Adelbert M. Bryan, the Chair of the St. Croix Board of Elections. Bryan — who, as a member of the Joint Board, had voted against the change in election procedures — testified that the DS200 had been purchased by the Territory in 2012 to comply with the federal Help America Vote Act ("HAVA"), which established numerous standards for elections systems, including the minimum criteria electronic voting machines and tabulators must meet. Bryan further testified that while the DS200 had not yet been used in a general election, he had not heard of any objections to these machines during the two years since they were purchased, and that in a February 2012 presentation to all members of the Boards of Elections, ES&S representatives had actually shown that the DS200 treated ballots in which straight-ticket and non-party ovals were simultaneously marked as votes for the nonparty candidate.

Mapp also testified in support of his own complaint. Mapp stated that he had used the DS200 on three separate occasions at demonstration events put on by the Boards of Elections, and that he was thus aware that feeding his own ballot into the DS200 would allow him to correct an overvote or undervote, a right which the Joint Board's new procedure would deny him. He further testified that the Joint Board's new procedure also cast doubt on the integrity of the election system, since "as a voter" he "will have no reasonable assurance that when the Board and its officials at the closing and locking of the polls at night if the ballots that they're feeding into the machine to be tabulated for the votes is [his] ballot." (Hr'g Tr. 144.)

---

set for trial," Mapp and Sarauw clearly could not comply with this requirement given that they filed their complaint on October 30, 2014, and the Superior Court held the consolidated injunction hearing and trial on the merits two days later on November 1, 2014. As such, the Superior Court abused its discretion by completely preventing Mapp and Sarauw's counsel from attempting to qualify Dr. Coverdale as an expert witness.

Finally, the Superior Court heard from Arturo Watlington, Jr., the Chair of the St. Thomas-St. John Board of Elections and Secretary of the Joint Board. He stated that the Joint Board decided to restrict use of the DS200 in such a manner because, under the Joint Board's interpretation of Virgin Islands law, an overvote occurs when a voter selects the straight-ticket option but then simultaneously selects other candidates. According to Watlington, a ballot in which the voter filled in an oval to vote straight-ticket for the Democratic Party but also fills in the oval for the Republican candidate for Delegate to Congress should be viewed as a spoiled ballot, since the individual has in effect voted for two candidates — the Democratic candidate and the Republican candidate — for an office in which he is only entitled to vote for one.[4] Because the DS200 treats such a ballot as a vote for the Republican candidate rather than as a spoiled ballot, Watlington contended that voters could not place their own ballot in the machine.

Later that afternoon, the Superior Court orally announced its findings of fact and conclusions of law. The Superior Court first held that it possessed jurisdiction over the case pursuant to section 76(a) of title 4 of the Virgin Islands Code. Proceeding to the merits, the Superior Court determined "that V.I. law does not mandate that voters have an opportunity to correct an overvote before casting his or her ballot," and "that V.I. law does not require that a voter at the polls be given notice that their ballot is spoiled before it is accepted or cast or that they be given notice that their ballot has an error before it is accepted or cast." (Findings Tr. 4.) It further found that "the DS200 machine discerns a voter intent contrary to law when a voter selects the party symbol with a full slate, and selects candidates outside that party," and that "there is no doubt that the DS200 machine will correctly tabulate most votes in accordance with V.I. law" and that "the design and intended use of the DS200 machine fosters

---

[4] Mapp and Sarauw also argue in their appellate brief that "[t]he Superior Court allowed almost complete obstruction" of their cross-examination of Watlington as it pertained to his interpretation of Virgin Islands elections law, particularly his understanding of how election officials should ascertain voter intent. However, this section of their appellate brief consists of only two paragraphs, which is mostly a summary of Watlington's testimony on direct examination and a statement that the Superior Court refused to allow certain questions on cross-examination. Since this issue has been "only adverted to in a perfunctory manner" and is "unsupported by argument and citation to legal authority," it is "deemed waived for purposes of appeal." V.I.S.Ct.R. 22(m).

confidence in Virgin Islands voters," for "[n]ot only would the voters be assured their vote was tabulated, but in some instances it alerts the voter to an error on their ballot and gives them an opportunity to secure a new ballot and eliminate the error." (Findings Tr. 4-5.) Yet despite finding that "[p]ermitting each voter to insert his paper ballot into the machine fosters confidence in the voting public that their vote was counted," the Superior Court determined that it "cannot give that benefit to the voters when that style of tabulation would result in the machine counting votes in a manner not consistent with V.I. law," and that it thus "would be unlawful . . . to require the Board of Elections to use the DS200 machine" because "[t]he DS200 is programmed to count certain votes in a way contrary to Virgin Islands law." (Findings Tr. 5-6.) As such, the Superior Court denied the motion for injunctive relief and dismissed Mapp and Sarauw's complaint with prejudice. Although it announced that it would issue an opinion explaining its reasoning in more detail within a week, to date the Superior Court has not memorialized its decision into writing.

Mapp and Sarauw timely filed their notice of appeal on Monday November 3, 2014, and on the same day filed a motion for summary disposition on the grounds that the general election was set to occur the next day. This Court, in an order entered later that afternoon, denied that motion because Mapp and Sarauw only provided this Court with a partial transcript of the November 1, 2014 hearing, thus making effective appellate review of the November 1, 2014 oral order impossible the afternoon before the election.[5] *See* V.I.S.Ct.R. 20. Nevertheless, in a November 5, 2014 order, this Court ordered that the parties brief this matter on an expedited basis, and that they also brief the issue of mootness given that the November 4, 2014 election had already occurred. The parties timely filed their briefs, respectively, on November 10, 2014, and November 12, 2014. On November 13, 2014, Mapp and Sarauw

---

[5] This Court notes that, although the Superior Court dismissed their complaint on Saturday, November 1, 2014, Mapp and Sarauw waited until Monday, November 3, 2014, to file their notice of appeal as well as their motion for summary disposition, notwithstanding the fact that they could have electronically filed their notice of appeal on November 1, 2014. *See* V.I.S.Ct.R. 40.3(b) (noting that documents may be e-filed as late as 11:59 p.m. on any given day). As such, while the failure to attach a complete transcript would, under other circumstances, have represented a curable defect, the failure of Mapp and Sarauw to even seek appellate review until the day before the election — a legal holiday on which the Supreme Court of the Virgin Islands is closed — eliminated any possibility of this Court being able to adjudicate the appeal on the merits prior to the November 4, 2014 general election.

moved this Court to issue its decision on an emergency basis so that the Boards of Elections may conduct the planned runoff election on November 18, 2014, in accordance with our ruling, which Fawkes and the Chairs of the Boards of Elections opposed on November 14, 2014. Also on November 13, 2014, Donna Christensen, the Democratic candidate for Governor, filed a motion to intervene for the sole purpose of joining Mapp in his request for the DS200 to be used during the run-off election. Although this Court denied that motion, it permitted Christensen to appear as an amicus curiae.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court." 4 V.I.C. § 32(a). To the extent the Superior Court's failure to memorialize its oral ruling into writing renders the underlying judgment nonfinal — an issue which we decline to determine as part of this appeal — this Court also possesses jurisdiction over "[i]nterlocutory orders of the Superior Court of the Virgin Islands . . . granting, continuing, modifying, refusing or dissolving injunctions," 4 V.I.C. § 33(b)(1), as well as "all inherent powers, including the power to issue all writs necessary to the complete exercise of its duties and jurisdiction under the laws of the Virgin Islands." 4 V.I.C. § 32(b).

The standard of review for this Court's examination of the Superior Court's application of law is plenary, while the Superior Court's factual findings are only reviewed for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007).

### B. Mootness

Before turning to the merits, we consider whether this appeal has become moot due to the fact that the November 4, 2014 general election has already occurred. Mapp and Sarauw contend that this case has not become moot, for while their complaint focused on the use of the DS200 during the November 4, 2014 general election, it is now clear that a run-off election will likely occur on November 18, 2014, as a result of none of the candidates for Governor achieving more than 50 percent of the vote. *See* 48 U.S.C. § 1591 ("If no candidates receive a majority of the

votes cast in any election, on the fourteenth day thereafter a run-off election shall be held between the candidates for Governor and Lieutenant Governor receiving the highest and second highest number of votes cast.").

■ Although Fawkes and the Chairs of the Boards of Elections argue, in their appellate brief, that this appeal has become moot for this reason, they nevertheless acknowledge that the mootness doctrine in the Virgin Islands is a non-jurisdictional claims-processing rule that has been incorporated into Virgin Islands law only as a matter of judicial policy. *Benjamin v. AIG Ins. Co. of P.R.*, 56 V.I. 558, 564 (V.I. 2012); *Vazquez v. Vazquez*, 54 V.I. 485, 489 n.1 (V.I. 2010). However, in their November 14, 2014 opposition to Mapp and Sarauw's motion for emergency action, Fawkes and the Chairs of the Boards of Elections, through their counsel, contend that the matter should be dismissed because the Joint Board voted on November 13, 2014, to allow voters to feed their ballots directly into the DS200.

■ We agree with Mapp and Sarauw that this case has not become moot. First, we note that Fawkes and the Chairs of the Boards of Elections have not provided this Court with any evidence that the Joint Board has, in fact, voted to rescind its prior policy for the run-off election; on this issue, they have provided us with nothing more than an unsworn representation from their counsel in the text of the opposition itself. *See Henry v. Dennery*, 55 V.I. 986, 994 (V.I. 2011) ("unsworn representations of an attorney are not evidence"). However, even if the Joint Board did, in fact, rescind that policy on November 13, 2014, its illegal act remains capable of repetition at some future date; for instance, were this appeal dismissed as moot, the Joint Board could hold a new vote on November 17, 2014, and decide to reinstate its policy, thus evading judicial review. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983) (case not moot "where [the alleged illegality] is capable of repetition, yet evades review"). Significantly, Fawkes and the Chairs of the Elections Boards still maintain that their initial decision to deprive voters of their ability to feed their ballot into the DS200 was legal, and thus a real dispute between the parties continues to exist. *United States v. Gov't of the V.I.*, 363 F.3d 276, 285 (3d Cir. 2004) (voluntary termination of contract does not render litigation to enjoin the contract

530

moot when defendant continues to defend the validity and soundness of the contract). Consequently, we decline to dismiss this appeal as moot.[6]

## C. The Merits

The Superior Court made numerous findings that supported entering judgment in favor of Mapp and Sarauw and enjoining Fawkes and the Chairs from enforcing the Joint Board's prohibition on voters feeding their own ballots into the DS200,[7] but instead it dismissed their complaint with prejudice for essentially two reasons: (1) that Virgin Islands law does not mandate that voters have the opportunity to correct overvotes or undervotes prior to casting their votes, and (2) that the DS200 tabulates votes in a way not authorized by Virgin Islands law. We disagree that either of these reasons justifies sustaining the Joint Board's decision in this case.

The Superior Court stated that no provision of the Virgin Islands Code requires the Boards of Elections to provide voters with a mechanism to correct potential overvotes or undervotes. However, the Superior Court ignored that the Virgin Islands Code is not the sole source of law in the

---

[6] We note that, in the November 14, 2014 opposition, counsel for Fawkes and the Chairs of the Elections Boards represents that the Joint Board decided to allow voters to use the DS200 during the run-off election because "[t]here will be no symbol voting during the run-off election," and has provided this Court with copies of sample ballots in which the party symbols used to effectuate straight-ticket voting are conspicuously absent. Assuming that the Joint Board has, in fact, chosen to eliminate the straight-ticket voting option for the November 18, 2014 run-off election, we express no opinion as to whether such action complies with Virgin Islands law because the issue is beyond the scope of this appeal.

[7] Ordinarily, when considering a request for a preliminary injunction, the Superior Court — and this Court, on appeal — must consider four factors:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Yusuf v. Hamed*, 59 V.I. 841, 848 (V.I. 2013) (quoting *Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548, 554 (V.I. 2012)). However, in this case the Superior Court's November 1, 2014 hearing constituted both a hearing on a request for a preliminary and permanent injunction and a trial on the merits, with the Superior Court ultimately dismissing Mapp and Sarauw's entire complaint with prejudice. As such, we — as the Superior Court did below — dispose of this case on the merits, rather than through the lens of the injunction factors. *See Alion Science & Technology Corp. v. United States*, 69 Fed. Cl. 14, 21 (Fed. Cl. 2005) ("[I]f the court enters judgment on the record against a plaintiff seeking equitable relief . . . the need to evaluate the injunction factors is rendered moot.").

Territory. As Mapp and Sarauw correctly note, HAVA, codified as 42 U.S.C. § 15301 *et seq.*, imposes significant requirements on state election systems, including the Virgin Islands. *See* 52 U.S.C. § 21141 ("In this chapter, the term 'State' includes . . . the United States Virgin Islands."). Significantly, HAVA expressly mandates that state voting systems meet the following minimum requirements:

> (i) permit the voter to verify (in a private and independent manner) the votes selected by the voter on the ballot before the ballot is cast and counted;
>
> (ii) provide the voter with the opportunity (in a private and independent manner) to change the ballot or correct any error before the ballot is cast and counted (including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error); and
>
> (iii) if the voter selects votes for more than one candidate for a single office —
>
>> (I) notify the voter that the voter has selected more than one candidate for a single office on the ballot;
>>
>> (II) notify the voter before the ballot is cast and counted of the effect of casting multiple votes for the office; and
>>
>> (III) provide the voter with the opportunity to correct the ballot before the ballot is cast and counted.

52 U.S.C. § 21081 (a) (1) (A).[8] Given that "[t]he Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," U.S. CONST. art. IV, § 3 cl. 2,

---

[8] We recognize that this provision provides that these requirements shall apply to elections for federal office, a term which is undefined in HAVA. It is clear that the November 4, 2014 general election involved an election for the federal office of Delegate to Congress. We note that it is not fully clear if an election for Governor of the Virgin Islands would qualify as an election for federal office; while Congress has manifested an intent for the Virgin Islands to be treated as a state for administrative purposes, *see In re Admission of Alvis*, 54 V.I. 408, 413 (V.I. 2010), the position of Governor of the Virgin Islands and the method of election is established by the Revised Organic Act of 1954, a federal statute. In any event, we need not decide this question as part of this appeal because courts have held that when a jurisdiction holds elections for federal and state offices simultaneously — as is the case in the Virgin Islands — HAVA's requirements must apply to all elections in the jurisdiction. *Kuznik v. Westmoreland C'ty Bd. of Comm'rs*, 588 Pa. 95, 902 A.2d 476, 493 (2006).

and Congress has expressly elected to impose HAVA's requirements on the Virgin Islands,[9] *see* 52 U.S.C. § 21141, the absence of explicit language in the Virgin Islands Code expressly providing for these rights cannot justify ignoring HAVA's statutory mandate.[10] Moreover, to the extent any doubt remains about the applicability of HAVA to the Virgin Islands, we note that the Virgin Islands Legislature enacted Act. No. 7334, section 3 of which requires that any voting machines used in a general election comply with HAVA:

> Act No. 5281 (Bill No. 17-0100), Section 3, subsection (a), is amended by striking the language " 'electronic' systems and electronic mechanical scanners and card readers that employ paper ballots or 'punch cards' shall not qualify as electronic voting machines within the meaning of this act" and insert *"only those voting machines and equipment that are EAC certified pursuant to The Help America Vote Act of 2002 (HAVA), Public Law 107-252, for Primary, General and Special elections shall be utilized as the official voting systems or equipment."*

---

[9] While the Supremacy Clause of the United States Constitution ordinarily requires state law to yield to federal law in the event of a conflict, "the Supremacy Clause has no direct role in a conflict between federal law and territorial law," since it "presents no competition between state and federal sovereignty," given that territorial governments exercise power delegated to them by the United States government. *Lewis v. Alexander*, 685 F.3d 325, 346 n.18 (3d Cir. 2012). However, because Congress has explicitly extended HAVA to the Virgin Islands, the Virgin Islands Government is required to follow that mandate pursuant to the Territorial Clause found in Article IV of the United States Constitution. *See also* 48 U.S.C. § 1574(c) ("[T]he legislature shall have power . . . to enact new laws not inconsistent with any law of the United States applicable to the Virgin Islands.").

[10] In their appellate brief, Fawkes and the Chairs of the Boards argue that the Virgin Islands complies with HAVA under an alternate provision authorizing jurisdictions that use paper ballot voting systems to establish voter education programs, *see* 52 U.S.C. § 21081(a)(1)(B), which serves as a substitute for compliance with 52 U.S.C. § 21081(a)(1)(A)(iii). However, although the HAVA issue was raised before the Superior Court, Fawkes and the Chairs of the Boards introduced no evidence at the November 1, 2014 hearing as to what efforts — if any — the Virgin Islands has made to comply with 52 U.S.C. § 21081(a)(1)(B). "This Court, as an appellate court, may not issue a decision based on speculation, 'but rather must consider the evidence of record and base its decisions on facts in the record.' " *Bryan v. Fawkes*, 61 V.I. 416, 473 (V.I. 2014) (quoting *Cross v. Kansas Dept. of Revenue*, 279 Kan. 501, 110 P.3d 438, 446 (2005)). Perhaps more importantly, 52 U.S.C. § 21081(a)(1)(B), by its own terms, only provides an alternate means of complying with 52 U.S.C. § 21081(a)(1)(A)(iii), and does not excuse compliance with sections 21081(a)(1)(A)(i) or (ii).

(Emphasis added). Thus, the Legislature has mandated that the Territory allow voters to use voting machines that comply with the voter protection rights mandated by HAVA, including notification of potential undervotes and overvotes. As such, the Superior Court committed error by holding that Virgin Islands voters possess no right to correct an undervote or overvote prior to casting their ballot.[11]

 Nevertheless, we share the Superior Court's concern that the DS200 — at least in the opinion of certain members of the Joint Board[12] — may not tabulate votes correctly. However, we emphasize that Mapp

---

[11] We recognize that the federal District Court of the Virgin Islands has held that HAVA does not itself codify a private right of action. *Samuel v. V.I. Joint Board Bd. of Elections*, Civ. No. 2012-0094, 2013 U.S. Dist. LEXIS 31538 (D.V.I. 2013) (unpublished). However, we note that other federal courts have held that even if HAVA itself does not establish a private right of action, individuals may enforce HAVA through 42 U.S.C. § 1983. *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004); *Florida Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1078 (N.D. Fla. 2004). Notably, the United States Supreme Court has recently emphasized that a claim may be brought under 42 U.S.C. § 1983 even without specifically pleading it in the complaint. *Johnson v. City of Shelby*, ___ U.S. ___, 135 S. Ct. 346, 347, 190 L. Ed. 2d 309 (2014) (holding that federal pleading standards do not require plaintiffs to cite to 42 U.S.C. § 1983 when the nature of the relief sought is otherwise clear); *Sigala v. Carmax Auto Superstores, LLC*, No. 1:14-cv-01451-SAB, 2014 U.S. Dist. LEXIS 158743, *17-18 (E.D. Cal. Nov. 10, 2014) (unpublished) ("A plaintiff need no more than inform defendants of the factual basis of the claim to stave off dismissal for want of an adequate statement of the claim.") (citing *Johnson*, 135 S. Ct. at 347.

We decline to decide, however, whether the voting rights provisions of HAVA may be enforced in federal court — whether through HAVA itself or through 42 U.S.C. § 1983 — because the Virgin Islands Legislature has implicitly adopted the HAVA voting standards through Act No. 7334. As this Court has repeatedly held, it is presumed that the Virgin Islands Legislature will not create a right without a remedy, and thus "statutes which are silent as to who has standing should be broadly interpreted to confer standing." *Bryan v. Fawkes*, 61 V.I. 201, 223 n.12 (V.I. 2014) (citing *V.I. Narcotics Strike Force v. Pub. Emps. Relations Bd.*, 60 V.I. 204, 212 (V.I. 2013); *accord Berne Corp. v. Gov't of the V.I.*, 105 Fed. Appx. 324 (3d Cir. 2004) (summarily rejecting claim that 5 V.I.C. § 80, the taxpayer standing statute, did not provide taxpayers with authority to sue government for violating 48 U.S.C. § 1401a). As such, because the Legislature extended HAVA's voting standards to the Virgin Islands through Act No. 7334 without expressly limiting who may sue to enforce the voting rights provisions, we conclude that Mapp and Sarauw possess standing to sue the Supervisor of Elections and the Boards of Elections to enforce their right to review their ballots for overvotes or undervotes on the approved voting machine before they are officially cast.

[12] Because it is not necessary to the disposition of this appeal, we express no opinion as to whether Watlington is correct that, under Virgin Islands law, a ballot containing a straight-ticket vote coupled with a vote for a candidate of a different party for the position of Delegate to Congress must always be treated as a spoiled ballot.

and Sarauw do not seek to have the results of any election decided solely by tabulating all votes with the DS200; rather, they seek to provide themselves and other Virgin Islands voters with the option to feed their own ballot into the DS200, for the purpose of the DS200 informing them as to whether they have overvoted or undervoted. While Virgin Islanders' right to cast a straight-ticket ballot is enshrined in the Virgin Islands Code, *see* 18 V.I.C. §§ 492(f), 523(10), the right to be privately notified of an overvote or undervote is a right established under federal law. The election officials in this case have provided no explanation as to why it was necessary to prevent in excess of 25,000 voters who cast ballots on November 4, 2014, from exercising their rights under 52 U.S.C. § 21081(a)(1)(A) for the sole purpose of making it easier to tabulate the less than 150 straight-ticket ballots that were received.[13]

On the contrary, it appears both rights could be safeguarded without sacrificing the integrity of the Virgin Islands election system. The uncontradicted testimony at the November 1, 2014 hearing established that paper ballots fed into the DS200 are not destroyed, but remain available in the event a hand recount is necessary. Thus, by way of example, elections officials could have allowed voters to feed their ballots into the DS200, and then, instead of relying on the DS200's tabulation, engage in virtually the same process they actually employed: obtain a new tabulation by hand counting the straight-ticket ballots and reinserting all other ballots into the DS200. Alternatively, elections officials could have allowed the voter-fed DS200's tabulation to stand, and perform a manual review of the straight-ticket ballots if a race is close enough so that the straight-ticket ballots could potentially affect the outcome. Or they could have given voters the option of either inserting their ballot directly into the DS200 for immediate tabulation, or placing it in the secure storage bin for review by elections officials, with visible signage explaining the straight-ticket ballot tabulation problem. In fact, the record contains

---

[13] This Court takes judicial notice of the election results released by the Supervisor of Elections on November 11, 2014, available at http://www.vivote.gov/sites/default/files/0648%20pm%20Report%20Nov%2011.HTM, and archived at http://perma.cc/GZU9-Z8XT, of which we take judicial notice. *See, e.g., Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of official information posted on a government website); *Jefferson Cnty. Election Comm'n v. Hollingsworth*, 2014 Ark. 431, 445 S.W.3d 504, 508 (2014) (taking judicial notice of election results issued by the Arkansas Secretary of State).

absolutely no evidence that elections officials even considered any methods less restrictive than completely forbidding all voters from inserting their ballots into the DS200, and in so doing they deprived the voters of their rights under HAVA. Therefore, because we agree with Mapp and Sarauw that HAVA gives voters the right to feed their ballots into the DS200 in order to alert them of an overvote or undervote, we reverse the November 1, 2014 oral order.

## III. CONCLUSION

For the foregoing reasons, we reverse the Superior Court's November 1, 2014 oral order denying Mapp and Sarauw's request for an injunction and dismissing their complaint with prejudice. We order the Supervisor of Elections and each of the elections boards to provide voters in the November 18, 2014 run-off election with the option to insert their ballot directly into the DS200 so that they may exercise their right under HAVA to be advised of any overvotes or undervotes. We remand the case to the Superior Court so that, on remand, it may enter judgment in favor of Mapp and Sarauw and consider any further challenges, if any, to the procedure implemented by elections officials to comply with this Court's decision.